# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2798/05-2938

_____

Joseph W. McAninch, Administrator    *
of the Estate of Damian Sinclair,    *
   *
      Plaintiff - Appellant/    *
      Cross-Appellee,    *
   *
     v.    *
   *
Susan Wintermute,    *
   *
      Plaintiff/Cross-Appellee,    *
   *
     v.    *
   *
The Kansas Bankers Surety Co.,    *
   *
      Defendant - Appellee/    *
      Cross-Appellant.    *


_____

No. 05-2870

_____

Appeals from the United States
District Court for the
Western District of Missouri.

Joseph W. McAninch, Administrator    *
of the Estate of Damian Sinclair;    *
   *
      Plaintiff,    *
   *
     v.    *
   *

Susan Wintermute,                          *

                  *

          Plaintiff - Appellant,      *

                  *

       v.                       *

                  *

The Kansas Bankers Surety Co.,    *

                  *

          Defendant - Appellee.    *

_____

Submitted: May 17, 2006
Filed: March 6, 2007
Substituted: June 27, 2007
_____

Before BYE, HANSEN, and SMITH, Circuit Judge.
_____

SMITH, Circuit Judge.

Damian Sinclair and Susan Wintermute, former directors of Sinclair National Bank ("SNB"), brought breach of contract claims and tort claims against their insurer, Kansas Bankers Surety Company ("KBS"), arguing that KBS wrongfully refused to indemnify and defend them under a Directors, Officers and Employees Indemnity and Bank Lender Liability Policy DL 1859 AR ("D&O Policy"). The district court[1] granted summary judgment to KBS on all the claims and subsequently denied Wintermute's motion for reconsideration of its grant of summary judgment. The administrator of Sinclair's estate, Joseph McAninch, and Wintermute appeal. We affirm in part and reverse in part.

---

[1]A United States Magistrate Judge presided with the consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

## I. *Background*

Sinclair and Wintermute[2] purchased Northwestern National Bank ("NWNB") of Gravette, Arkansas, on March 3, 2000, and changed its name to SNB. They served as the principal shareholders of SNB. KBS issued a D&O Policy to SNB for the policy period of October 7, 2000, to October 7, 2001. Sinclair and Wintermute were listed as directors of SNB in the application for insurance.

The D&O Policy provided that KBS "shall" indemnify each bank director, officer, or employee "for personal Loss which the Director or Officer or Employee is legally obligated to pay by reason of any Wrongful Act solely in their capacities of Director or Officer or Employee of the Bank which is first Discovered during the Policy Period."[3]

---

[2]Wintermute is the ex-wife of Sinclair.

[3]The D&O Policy defines "discovery" as:

> when any Director or Officer or Employee first becomes aware of facts which would cause a reasonable person to assume that a Loss covered by the policy has been or will be incurred, even though the exact amount or details of the Loss may not be known. All Loss involving the same acts or interrelated acts shall be deemed to have been Discovered at the time of first Discovery.

"Loss" is defined in the D&O Policy, in relevant part, as:

> any amounts which the Directors or Officers or Employees are legally obligated to pay . . . for a claim or claims made against the Directors or Officers or Employees for Wrongful Acts and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation . . . and defense of legal claims . . . except as excluded from coverage under Section IV.

-3-

On September 7, 2001, the Office of the Comptroller of the Currency (OCC) closed SNB, and the Federal Deposit Insurance Corporation (FDIC) was appointed receiver of SNB's assets. KBS initially sent a letter to SNB purporting to cancel existing policies but followed that letter one day later with a corrected notification advising SNB that it would not renew the D&O Policy and that the policy would expire by its terms on October 7, 2001.

By letter dated September 26, 2001, Eli Greenburg, Wintermute's attorney, advised KBS that the FDIC might assert possible claims against officers and directors of SNB. The letter specifically stated that "[t]he FDIC has provided oral, informal notice that there may be claims against the officers and directors of Sinclair National Bank for negligence, breach of fiduciary duty and possibly other wrongful conduct." The letter named Sinclair and Wintermute, among others, as individuals against whom claims may be made.

By letter dated September 27, 2001, Helen Davis Chaitman, Wintermute's attorney, provided notice to KBS that her law firm received a subpoena from the OCC demanding production of files of SNB's officers and directors. The next day, Charles M. Towle, Vice President of KBS, spoke with Chaitman by telephone and advised her that the D&O Policy provided no coverage for any future claims made against any officer or director of SNB by the OCC, FDIC, or any other state or federal officials or agencies. Towle subsequently wrote a letter to Chaitman, affirming his previous

---

Finally, the D&O Policy defines "wrongful act" as:

> any actual or alleged 1) error or misstatement; or 2) misleading statement; or 3) act of omission; or 4) breach of duty; or 5) breach of fiduciary duty; or 6) any other act by the Directors or Officers in the discharge of their duties, individually or collectively, which is claimed against them solely by reason of their being Directors or Officers or Employees of the Bank.

-4-

statement that Exclusion No. 3 of the D&O Policy applied and excluded coverage for any future claims made against the officers and directors of SNB.[4]

On June 17, 2003, Sinclair filed the instant action against KBS in the circuit court of Green County, Missouri. The case was removed to the United States District Court for the Western District of Missouri on August 4, 2003. The third amended complaint alleged three causes of action: (1) a declaratory judgment that KBS had a duty to defend Sinclair in any legal or other proceeding brought that alleged any "wrongful act" as the term is defined in KBS's insurance policy; (2) breach of contract; and (3) libel and slander per se.

On September 12, 2003, the State of Missouri filed an indictment against Sinclair, charging him with 24 counts of securities fraud. Five days later, a federal grand jury indicted Wintermute on charges of conspiracy and making false statements. Sinclair's attorney, William McDonald, notified KBS on September 25, 2003, about Sinclair's state indictment and Wintermute's federal indictment. In response, Towle told McDonald that Exclusion No. 3 applied.

On November 20, 2003, a nine-count superseding federal indictment was returned against Wintermute and Sinclair. Count I charged them with conspiracy to commit five of the substantive offenses. Count II charged them with filing a false

_____

[4]Exclusion No. 3 of the D&O policy provides:

The Underwriter shall not be liable to make any payment or provide any defense in connection with any claim for Loss made against the Bank or Directors or Officers or Employees:

3) by any State or Federal official agency, including b[ut] not limited to the Federal Deposit Insurance Corporation, whether such official or agency is acting as receiver, liquidator, supervisor, regulator, or in any other capacity.

-5-

statement, alleging that on December 8, 1999, *before they purchased NWNB*, Sinclair and Wintermute "knowingly and willfully falsified, concealed and covered up by a trick, scheme and device a material fact in an application to the [OCC] . . . ." Count III only charged Sinclair with filing a false statement in August 2000 to the OCC. Count IV charged both Wintermute and Sinclair with illegal participation, alleging that Wintermute and Sinclair, "as *owners and directors* of [SNB,] caused [SNB] to purchase loans from Stevens Financial Group while concealing their financial relationship with Stevens Financial Group." (Emphasis added). Under Count V, only Sinclair was charged with obstructing examination of a financial examination in May 2000. Both Wintermute and Sinclair were charged with misapplication of funds under Count VI for "being *directors and otherwise connected in any capacity* with [SNB]" that "knowingly and willfully embezzled, abstracted, purloined and misapplied monies, funds, and credits belonging to and entrusted to the care and custody of [SNB]" by causing SNB "to purchase and acquire loans for approximately $15 million from Stevens Financial Group." Count VII and Count VIII charged them both with bank fraud. Finally, Count IX—Criminal Forfeiture—stated that, if convicted of certain counts, Wintermute and Sinclair would forfeit property gained through the violations.[5]

Prior to Wintermute's criminal trial, Wintermute's counsel, Devon Sherwood, subpoenaed Towle to appear at Wintermute's trial; the subpoena directed Towle to bring the crime-bond file with him to trial. KBS had written a separate policy which indemnified the bank from criminal defalcations of its officers and employees (which the parties called the "crime bond"), and the FDIC, acting as Receiver on behalf of the failed Bank, had filed a proof of loss with KBS seeking to recover on the crime bond for Sinclair's alleged criminal activities. On Towle's behalf, Ann Hoover, an attorney

---

[5]Following Sinclair's death on December 4, 2003, the state indictment and the superseding federal indictment against him were dismissed. Additionally, Joseph McAninch, the court-appointed administrator of Sinclair's estate, was substituted as plaintiff in the instant case, and Wintermute was added as a plaintiff.

for KBS, made an offer to Sherwood that KBS would produce a copy of the file in response to the subpoena without Towle's attendance at trial. Sherwood accepted the offer, on the condition that the government stipulated to the documents. Because KBS was unable to obtain the stipulation, Hoover filed a motion to quash the subpoena on the ground that it was "unreasonable and oppressive." Because the court never issued an order on the motion to quash, Towle and Hoover attended Wintermute's trial on July 29, 2004. They were present in the courthouse from 1:15 p.m. until 5:05 p.m. Towle brought the KBS file with him as the subpoena directed. Wintermute's attorneys, however, never called Towle to testify, nor did Hoover or Towle identify themselves to Wintermute's attorneys to notify them of their presence.

On August 4, 2004, Wintermute was convicted of Counts I and II of the superseding indictment: conspiracy to file a false statement and filing a false statement in connection with her application for a change in control of the bank. She was acquitted of Counts IV, VI, VII, and VIII of the superseding indictment, as well as the charges of conspiracy to commit those offenses. The court dismissed Count IX after the return of the verdict because Wintermute was acquitted on the counts on which Count IX depended.

On October 19, 2004, Wintermute filed her second amended complaint in the instant action, setting forth three causes of action against KBS: (1) declaratory judgment as to coverage under the D&O Policy; (2) breach of contract for failure to reimburse Wintermute for her legal expenses in successfully defending against the claims of the indictment covered by the D&O Policy; and (3) malicious interference with Wintermute's defense.[6]

On February 14, 2005, Wintermute filed a motion to compel KBS to produce documents responsive to Wintermute's written document demand. Specifically, she

---

[6]The district court construed Wintermute's claim for malicious interference with her criminal defense as a prima facie tort claim.

sought the production of documents relating to the crime bond that KBS issued to SNB. Sherwood requested the same documents in Wintermute's criminal trial. On March 1, 2005, the district court ordered KBS to produce all responsive documents for in camera inspection and, on March 11, 2005, granted in part Wintermute's motion to compel, ordering KBS to produce 525 pages of documents. Among the 525 pages of documents is a September 7, 2001 "Proof of Loss" filed in the name of SNB, attributing losses in the amount of $ 838,884.22 to the "dishonest actions of Damian Sinclair." The 525 pages of documents included the communications between Towle and the FDIC concerning the Proof of Loss.

According to Wintermute, the Proof of Loss and supporting documents included 12 documents containing her forged signature. In addition, she claims that the crime-bond file contained communications between the FDIC and Towle concerning the Proof of Loss under the crime bond. Therefore, on March 30, 2005—two weeks after receiving the crime-bond file—Wintermute filed a motion for leave to serve additional expedited discovery, arguing that the documents exculpated her of criminal liability. Wintermute's theory was that KBS deliberately avoided production of the crime-bond file because it hoped that she would be convicted; if the jury convicted her on the counts relating to her conduct as a bank director, KBS would have no liability under the D&O Policy. The district court denied Wintermute's motion to serve additional discovery.

The parties subsequently submitted cross-motions for summary judgment. In support of its motion for summary judgment, KBS argued that the D&O Policy did not cover Sinclair and Wintermute's criminal defense costs because the loss did not arise by reason of a "wrongful act" as defined by the policy. In addition, KBS argued that certain policy exclusions applied. Regarding Wintermute's separate tort claim for malicious interference with her criminal defense, KBS argued that Wintermute's claim failed as a matter of law because she could not prove the elements of a prima facie tort. Regarding McAninch's separate tort claim for defamation, KBS argued that

Sinclair's claim abated on his death and no showing was made that the contested statements were untrue or were published.

In response, Wintermute argued that, by its terms, the D&O Policy did provide her coverage for losses sustained in connection to her criminal defense. She asserted that the policy's definition of "wrongful act" is ambiguous, meaning that the court must construe it in favor of the insured. Additionally, she argued that issues of material fact precluded summary judgment on her malicious interference claim.

McAninch argued that KBS waived or was estopped from asserting any defense to coverage because KBS "insured over" a Memorandum of Understanding and other documents filed by federal regulatory agencies, which he argued constituted a continuing claim under both the D&O Policy and the crime-bond policy indemnifying the bank for losses sustained due to criminal acts of its employees and officers. Regarding his claim for defamation, McAninch argued that the claim arose before Sinclair's death and that the court should not allow KBS to assert the defense of truth in connection to "actions which were wrong in the first place, i.e., denial of a defense of coverage."

The district court granted KBS's motion for summary judgment as to all claims and all parties and denied McAninch's and Wintermute's motions for summary judgment. Wintermute subsequently filed a motion for reconsideration, arguing that the court erroneously granted summary judgment on her tort claim on a ground not previously raised. In addition, Wintermute argued that the court erroneously found that she did not act solely in her capacity as a director. The district court denied Wintermute's motion.

Both McAninch and Wintermute appeal the judgment of the district court.

## II. *Discussion*

McAninch appeals the court's grant of summary judgment in KBS's favor, arguing that the district court (1) lacked jurisdiction; (2) erred in several of its pretrial rulings; and (3) erred by not finding that KBS waived or was estopped from asserting any defenses to coverage.

Wintermute also appeals, arguing that the district court erred (1) in holding that the D&O Policy provided no coverage to Wintermute; (2) in holding that she suffered no compensable injury on her tort claim; and (3) in denying her motion for reconsideration.

### A. *Jurisdiction*

McAninch argues that the district court lacked personal jurisdiction over him because he never personally appeared before the district court. Additionally, he argues that the district court lacked subject matter jurisdiction over his claim against KBS because the claim is part of Sinclair's estate, meaning that the probate exception to diversity jurisdiction applies; therefore, the district court erred by not granting his motion to remand. We review de novo questions of subject matter jurisdiction, *Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002, 1004 (8th Cir. 2006), and questions of personal jurisdiction. *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006).

We reject McAninch's contention that the district court lacked personal jurisdiction over him. A "plaintiff consents to personal jurisdiction by virtue of the act of bringing the suit in the given forum." *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 645–46 (6th Cir. 2006). When the district court granted plaintiff's motion to substitute McAninch as plaintiff, McAninch consented to the district court's personal jurisdiction over him.

We also reject McAninch's argument that the "probate exception" to diversity jurisdiction applies. The Supreme Court recently explained that "the probate exception reserves to state probate courts the probate or annulment of a will and the

administration of a decedent's estate" and "also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." *Marshall v. Marshall*, 126 S. Ct. 1735, 1748 (2006). However, the probate exception "does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction." *Id.* Therefore, if the plaintiff "seeks an *in personam* judgment against [the defendant]" and not "a *res* in the custody of a state court," the federal district court may properly adjudicate the claim. *Id.* Here, McAninch's claims against KBS do not relate to probate matters; instead, McAninch sought an in personam judgment against KBS, asking the district court to declare that KBS had a duty to defend Sinclair; find that KBS breached its contract with Sinclair; and find that KBS libeled Sinclair.

## B. *Pretrial Rulings*

Next, McAninch argues that the district court erroneously denied his motions to (1) file an amended complaint, (2) join SNB as a plaintiff; and (3) disclose grand jury testimony.

### 1. *Amendment of Complaint*

McAninch moved to file his first amended complaint to assert additional claims and allegations of fact against KBS. The district court, however, found that the "proposed amended complaint," which added "some 143 pages of allegations and 16 additional claims" against KBS, "compare[d] unfavorably to the petition originally filed," which was only 9 pages long. The district court found the proposed amended complaint to contain "lengthy, irrelevant, and largely incomprehensible factual allegations, discussions of case law supposedly supporting claims, and argumentative responses directed at defendant's answer to the original petition." Therefore, the district court determined that McAninch's proposed amendment would be "futile and improper." In addition, the district court found that the proposed amendment failed to comply with Rule 8 of the Federal Rules of Civil Procedure because "none of the counts alleged contain[ed] a 'short and plain statement of the claim showing that the pleader is entitled to relief,' or an adequate summary of the *relevant* facts supporting

plaintiff's conclusory allegations (i.e., claims of fraud, mistake, and misrepresentation)." (Emphasis in original).

A district court should freely give leave to a party to amend its pleadings when justice so requires, Fed. R. Civ. P. 15(a); however, it may properly deny a party's motion to amend its complaint when such amendment would unduly prejudice the non-moving party or would be futile. *Kozohorsky v. Harmon*, 332 F.3d 1141, 1144 (8th Cir. 2003). Based on the district court's reasoning, and considering that the proposed amendment could have "result[ed] in the burdens of additional discovery and delay to the proceedings," *Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 943 (8th Cir. 2000), we find that the district court did not abuse its discretion in denying McAninch's motion to amend the complaint.

## 2. *Joinder of SNB*

McAninch also moved to join SNB as a plaintiff to assert bond claims on the bank's behalf, arguing that a dissolved corporation continues to exist for the purpose of winding up its affairs. The district court denied McAninch's motion, concluding that "Plaintiff's rights as a shareholder and director of [SNB], including the right to wind up its affairs and file claims on its behalf, were ceded to the FDIC as receiver of the Bank."

We hold that the district court did not abuse its discretion in denying McAninch's motion to join SNB as a plaintiff. *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, and Helpers of Am., Local 878 v. Commercial Warehouse Co.*, 84 F.3d 299, 302 (8th Cir. 1996). Section 1821(d)(2)(A)(i) of 12 U.S.C. provides that the FDIC, as receiver, succeeds to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution . . . ." Therefore, because SNB ceded all of its rights to the FDIC, including the right to wind up its affairs, the district court properly determined that SNB ceased to exist and could not be joined as a plaintiff.

### 3. *Disclosure of Grand Jury Proceedings*

McAninch requested that the district court order grand jury disclosures relating to the OCC's interaction with NWNB, SNB, Sinclair, and Wintermute. *See* Fed. R. Crim. P. 6(e)(3)(E)(i) (permitting a court to authorize disclosure of grand jury proceedings "preliminarily to or in conjunction with a judicial proceeding."). However, the district court denied McAninch's motion, finding that McAninch failed to show any particularized need for the requested materials.

A district court called upon to decide whether grand jury transcripts should be released is "infused with substantial discretion." *Douglas Oil Co. of Cal. v. Petrol Stops Northwest*, 441 U.S. 211, 223 (1979). The district court should consider "the extent of the need for continuing grand jury secrecy, the need for disclosure, and the extent to which the request was limited to that material directly pertinent to the need for disclosure." *Id.* This amounts to a showing of a "particularized need" for the materials. *United States v. Warren*, 16 F.3d 247, 253 (8th Cir. 1994).

Here, the district court determined that McAninch failed to make any showing of a particularized need for the requested materials because he admitted that the "exact same testimony" could probably be obtained from the witness through deposition. In addition, although McAninch argued that the witness's testimony would establish "huge portions" of his allegations, the district court noted that those "allegations" were only presented in proposed amended complaints, which the district court had previously rejected. Although the presiding magistrate judge was not the judge who supervised the grand jury—the ideal person to review a disclosure request—he does sit within the same district as the supervising district judge. *Douglas*, 441 U.S. at 225–26. Because the trial judge sits within the same district as the supervising judge, he was capable of "discover[ing] facts affecting the need for secrecy" in deciding whether to grant McAninch's motion. *Id.* Therefore, the district court properly denied McAninch's motion to disclose grand jury testimony.

C. *Insurance Claims*

McAninch and Wintermute both challenge the district court's grant of summary judgment to KBS based on its determination that Sinclair and Wintermute were not entitled to indemnification from KBS for their losses. We review de novo a district court's grant of summary judgment. *Harris v. Hays*, 452 F.3d 714, 717 (8th Cir. 2006).

KBS argues that the district court correctly granted summary judgment in its favor because, under the plain terms of the policy, no coverage exists for the criminal defense of Wintermute and Sinclair. In the alternative, KBS argues that Exclusion No. 3 of the D&O Policy precludes coverage.

1. *Wintermute's Argument*

Wintermute was indicted on six counts alleging criminal conduct related to her involvement with SNB. Part of Count I and all of Count II, of which Wintermute was convicted, allege criminal conduct occurring before she was a director. She concedes that the cost of defending against those allegations is not covered under the insurance policy. The remaining four charges (Counts IV, VI, VII and VIII) all allege conduct undertaken as a director. Count IV alleges that Wintermute and Sinclair, acting in their capacity as "owners and directors of SNB," violated the illegal participation statute. Count IV also incorporates the allegations of paragraphs 17, 27, and 40 of the indictment, which charge Wintermute with acting in her capacity as a director.[7] While

---

[7]Paragraph 17 provides:

> On or about March 21, 2000, SINCLAIR and WINTERMUTE voted, as members of the Sinclair National Bank board of directors, to authorize the bank to purchase $2.5 million of loans per month from Stevens Financial Group, including loans in which WINTERMUTE had a financial interest.

-14-

Count VI charges Wintermute and Sinclair with the misapplication of bank funds "[as] directors [of SNB] *and otherwise connected in any capacity*," it specifically incorporates the "acting as directors" allegations of paragraphs 17, 27, and 40. Similarly, while Counts VII and VIII do not specifically assert any capacity in which Wintermute allegedly committed bank fraud, they too incorporate the allegations of paragraphs 17 and 27 of the indictment.

Wintermute argues that the plain language of the policy provides coverage for directors who engage in or are alleged to have engaged in a breach of fiduciary duty, act of omission, breach of duty, or any other act—not just directors who are sued based solely on their status as directors. Alternatively, she contends that the policy language is ambiguous as to whether coverage is limited to suits against directors based solely on status or whether the policy is also intended to provide coverage for actual or alleged wrongful acts.

"In reviewing an insurance policy, when the terms of the policy are clear, the language in the policy controls." *Curley v. Old Reliable Cas. Co.*, 155 S.W.3d 711,

Paragraph 27 provides:

It was further part of the conspiracy that after acquiring Sinclair National Bank, SINCLAIR and WINTERMUTE, acting as bank directors, and concealing that STEVENS owed them $5 million, would directly and indirectly enrich themselves and others by fraudulently approving the purchase by the bank of Stevens Financial Group loan portfolios, which included loans in which they had held an undisclosed financial interest.

Paragraph 40 provides:

On or about March 21, 2000, while concealing from other directors their financial interests in the loans and their relationships with STEVENS and Stevens Financial Group, SINCLAIR and WINTERMUTE voted, as Sinclair National Bank directors, to purchase $2.5 million of loans per month from Stevens Financial Group.

-15-

713 (Ark. App. 2004). The court will give effect to the policy's plain language without resorting to rules of construction if the policy provision is unambiguous. *Id.* "A policy will not be interpreted to bind the insurer to a risk that it plainly excluded and for which it was not paid." *Id.* However, if "the policy language is ambiguous, and thus susceptible to more than one reasonable interpretation, the policy will be construed liberally in favor of the insured and strictly against the insurer." *Id.* Because the court is to construe language in an insurance policy in its "plain, ordinary, and popular sense," the fact that a term is not defined in the policy "does not automatically render it ambiguous." *Id.* The court must read the different clauses of the contract together and construe the contract so all parts harmonize. *Id.*

The district court concluded that there was no coverage because Wintermute was indicted based on probable cause to believe that she committed criminal offenses. According to the district court, the policy would only have provided coverage if Wintermute had been indicted solely based on her status as a director. In other words, a director who commits or is alleged to have committed specific wrongful acts has no coverage, whereas a director caught up in litigation merely as a result of her status as a director has coverage. We cannot agree.

To adopt the district court's interpretation would require us to ignore the plain language of the policy. Section I states that it provides coverage to directors who incur personal loss "by reason of any Wrongful Act solely in their capacities of Director." Section III defines wrongful acts as "any actual or alleged" error or misstatement, misleading statement, act of omission, breach of duty, breach of fiduciary duty, or any other act. If the policy only provides coverage to directors sued solely because of their status—and not for any actual or alleged wrongful acts—the "actual or alleged" language is rendered nugatory. The district court's construction of this contract fails to harmonize—or for that matter acknowledge—the language which expressly provides coverage (subject to various exclusions) for actual or alleged wrongful acts. In so doing, the district court gives no voice to the distinction between coverage for claims based on wrongful acts and claims based on status. A proper reading of the

-16-

policy—one which gives meaning to all its terms—reveals it is intended to provide coverage to directors for claims based on conduct and for claims based on status. *See* William E. Knepper & Dan A. Bailey, *Liability of Corporate Officers and Directors* § 24-4, at 396–97 (5th ed. 1993) (noting in D&O policies "wrongful acts" are defined in terms of conduct and status). Cases interpreting similar policy language support this construction.

In *Federal Savings & Loan Insurance Corp. v. Mmahat*, 97 B.R. 293, 298 (E.D. La. 1988), an attorney acted as corporate attorney and corporate director. The court held that the definition of "Wrongful Act" included coverage for wrongful conduct but held Mmahat's conduct fell within an exclusion triggered when the insured's actions are designed to gain personal profit or illegal advantage. *Id*. at 299. In *Bank of Carbondale v. Kansas Bankers Surety Co.*, 755 N.E.2d 543, 545 (Ill. App. 2001), the court was called upon to apply policy language identical to the provision at issue in this case. The court easily concluded that the policy was intended "to indemnify the officers and directors for any loss that they are legally obligated to pay by reason of any wrongful act in their capacity as an officer or director." *Id*. at 545–46; *see also Ratcliffe v. Int'l Surplus Lines Ins. Co.*, 550 N.E.2d 1052, 1053–54 (Ill. App. 1990) (finding coverage for corporate officers sued for alleged wrongful acts committed while acting as officers of a privately held corporation and as trustees or agents of trustees for family-member shareholders).

These cases establish that the term "solely" is not intended to limit coverage to claims based on status, while abrogating the policy's clear intention to also provide coverage for claims based on conduct. Thus, KBS may not avoid its duty to indemnify as to Counts IV, VI, VII and VIII simply because the indictment alleged actual misconduct.

Next, KBS argues that there is no coverage for actual or alleged wrongful acts of directors and officers committed while acting in other or multiple capacities. According to KBS, the indictment alleged wrongful conduct undertaken before

-17-

Wintermute was a director, and while acting as a director, owner, and otherwise connected in any capacity with SNB. Therefore, it contends that Wintermute's wrongful actions were not alleged against her solely by reason of her being a director.[8] In support of its argument, KBS cites *Olson v. Federal Insurance Co.*, 219 Cal. Rptr. 90 (Cal. App. 1990), *Beck v. American Casualty Co.*, Civ. A. No. Mo-88-CA-303, 1990 WL 598573 (W.D. Tex. April 12, 1990) (unpublished), and *Mmahat*, 97 B.R. at 298.

In *Olson*, brothers Dean and Glenn Olson formed Olson Farms and served on its board of directors. 219 Cal. Rptr. at 91. In addition, the brothers started a second company which was managed by Olson Farms but was entirely separate. *Id.* A dispute arose between the two over management of the second company, and Glenn sued Dean claiming breach of contract. *Id.* Later, Dean objected to actions taken by the board of directors for Olson Farms and filed three separate lawsuits to prevent the board from divesting part of Olson Farms's assets and to prevent a takeover. *Id.* at 92. After the four cases were resolved, Dean sought indemnification from Olson Farms's D&O carrier for the attorney's fees that he expended in connection with the lawsuits. *Id.* The carrier sought summary judgment, arguing that Dean's claims fell outside the policy's coverage because they were not related to wrongful acts committed in the discharge of his duties to Olson Farms in his insured capacity, i.e., as a director. *Id.* at 92–93. The California Court of Appeals agreed and held that the carrier had no duty to indemnify. In the first suit, the court held the allegations did not involve Olson Farms and that Dean was not sued in connection with his duties as a director. *Id.* at 94. In the second suit, which was filed against Olson Farms and its board of directors, the court found the claim for indemnification did not fall within policy language because no accusations of wrongful conduct were leveled against Dean. *Id.* at 94–95. Finally,

[8]Wintermute concedes that there is no coverage for the costs of defense related to Counts I and II. Counts VII and VIII incorporate the allegations of paragraphs 17 and 27 of the indictment which only allege Wintermute acted as a director. Accordingly, KBS's argument only applies to Counts IV and VI.

as to the third and fourth lawsuits, the court held that Dean was acting in his capacity as a shareholder and not a director. *Id.*

In Wintermute's case, the indictment clearly alleges wrongful conduct against her undertaken in her capacity as a director of SNB. To the extent that KBS argues that there is no coverage because Wintermute acted in multiple capacities, *Olson* is inapposite. *See also Raychem Corp. v. Fed. Ins. Co.*, 853 F. Supp. 1170, 1184 (N.D. Cal. 1994) (interpreting *Olson* as involving suits brought for the sole purpose of protecting shareholder interests).

In *Beck*, two individual purchasers of the stock of a savings and loan association had brought suit in Texas state court against several of its selling shareholders—some of whom had served as directors—alleging misrepresentation in connection with the sale. 1990 WL 598573, at *4. The allegations of misrepresentation against the shareholders were asserted "in their capacity as 'Inside Shareholders,' not as officers or directors of the Association." *Id.* at *14. A third plaintiff (another savings and loan) asserted claims only against the former directors, alleging that they mismanaged the savings and loan while serving as directors. *Id.* at *4. The state law suit was settled and the selling shareholders/directors sought indemnification from the savings and loan's D&O carrier in federal court. The federal district court granted summary judgment to the insurer, finding that the claims by the two individual state court plaintiffs had only alleged wrongful acts against the insureds in their capacity as selling shareholders, not against them as directors or officers. *Id.* at *14–15. Thus, as in *Olson*, there was no allegation that the shareholders were acting in a dual capacity.

Though not specifically addressed, it appears that the district court in *Beck* also refused to order indemnification for the costs of defense related to the claims brought against the defendants solely in their capacities as directors. *Id.* If so, we find the district court's reasoning as to those claims unpersuasive. Most notably, the district court offered no legal precedent to support its unexamined basis for denying coverage, and our research reveals nothing to support the conclusion that the presence of

uncovered claims obviates an insurer's duty to indemnify its insured with respect to covered claims. Instead, we find ample support for the opposite conclusion. *See Ameriwood Indus. Int'l Corp. v. Am. Cas. Co. of Reading, Pa.*, 840 F. Supp. 1143, 1159–60 (W. D. Mich. 1993) (denying summary judgment on D&O policy regarding issue of loss allocation between covered and uncovered claims); *Faulkner v. Am. Cas. Co. of Reading, Pa.*, 584 A.2d 734, 745 (Md. Ct. Spec. App. 1991) (holding a D&O policy insured's entitlement to defense costs was limited to those claims for which coverage was found to exist); *see also Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966, 969 (8th Cir. 1999) (recognizing insurance carrier owes a duty to indemnify for covered losses); *Enron Corp. v. Lawyers Title Ins. Corp.*, 940 F.2d 307, 311 (8th Cir. 1991) (holding an insurance carrier is only liable for costs of defense on covered claims even if joined with uncovered claims).

Finally, KBS argues that *Mmahat* clearly supports its position that there is no coverage under a D&O policy for directors when the actual or alleged wrongful acts are undertaken while acting in a dual capacity. In *Mmahat*, an attorney used his positions as corporate attorney and corporate director "to gain personal profit and advantage to which he was not legally entitled." 97 B.R. at 299. "[The] evidence clearly establish[ed] that Mmahat closed loans to generate fees for his law firm and that he controlled the board of directors to such an extent that any objection to his actions would have been overridden by him." *Id*. at 298. The court found coverage but held that Mmahat's conduct fell within an exclusion triggered when the insured's actions are designed to gain personal profit or illegal advantage. *Id*. at 299. The court went on to state that "[b]ecause Mmahat's liability herein arises in the context of his dual role as director and attorney . . ., the Court also questions whether the loss at issue arises 'solely' from his capacity as a director." *Id*.

This language, upon which KBS relies heavily, is dicta. More importantly, *Mmahat* is distinguishable from the present case because the court found that "Mmahat's dishonesty as a director was an integral part of his dishonesty as a lawyer." *Id*. In other words, but for his dual role, Mmahat would not have been able to

accomplish his wrongful conduct. Here, Count IV alleges that Wintermute acted as an owner and director, while Count VI alleges that she acted as a director and as otherwise connected in any capacity with SNB. The counts, however, offer no explanation of how being an owner or associated in some other unidentified capacity with SNB facilitated the alleged wrongful conduct. For its part, KBS merely references the language of the indictment, while offering nothing to explain how Wintermute's dual status facilitated the alleged wrongdoing. We conclude that an insurer may not avoid its duty to indemnify for alleged wrongful conduct merely by arguing the director was also an owner, shareholder, etc., without some explanation as to how this dual capacity relates to or facilitated the wrongful conduct alleged. To hold otherwise would invite carriers to deny coverage based on factors unrelated to the risk underwritten.

Finally, in holding that the district court erroneously granted summary judgment to KBS, we also reject KBS's argument that Exclusion No. 3 of the D&O policy applies. The "loss" for which Ms. Wintermute seeks indemnity is what she has paid or will pay for the costs of investigation and legal defense for the claims made against her in those Counts and portions of the Indictment for which the jury acquitted her. Those are amounts she incurred and we presume she is legally obligated to pay as defense costs (without determining their reasonableness) for the claims made against her as a Director for the Wrongful Acts (albeit asserted in the Indictment to be criminal acts but nevertheless fitting the policy's definition of Wrongful Acts) she allegedly committed as a Director. Exclusion No. 3 does not exclude, and KBS cites to no authority holding that claims brought by sovereign governments themselves for alleged criminal activity fall within the boundaries of Exclusion No. 3. Our reading of Exclusion No. 3 is that it is designed purposely to exclude coverage for any claim for loss made by those state and federal officials and agencies whose duty it is to administratively regulate and supervise banks. An Indictment returned by a federal grand jury acting on behalf of the people of the United States is not an action by a federal "agency" or by a federal "official" within the plain meaning of Exclusion No. 3, and hence, Exclusion No. 3 does not bar coverage for Wintermute's defense costs

-21-

claim.  Had KBS intended to exclude from coverage any and all costs or losses or attorneys fees arising out of or attendant to any criminal charge made against its insured, a simple declarative sentence could have been easily inserted into the policy.

### 2. *McAninch's Argument*

In contrast to Wintermute, McAninch does not argue that Sinclair's criminal defense is covered under the policy. Instead, he argues that KBS waived and is estopped from asserting any policy exclusions or defenses and that such policy exclusions and defenses are void. To support his argument, McAninch alleges that KBS "insured over" a December 14, 1998 Memorandum of Understanding ("MOU") from the OCC to NWNB and all claims arising therefrom. Additionally, he alleges that KBS attempted an improper cancellation and general denial of coverage under the D&O Policy, thereby breaching the insurance contract.

Initially, we disregard McAninch's argument that KBS "insured over" the MOU. The district court determined that the MOU was not properly authenticated under Federal Rule of Evidence 901 and McAninch has not challenged that determination on appeal. Therefore, we will not consider the MOU in ruling on his waiver and estoppel arguments.

Arkansas law provides that an insurer waives the defense of noncoverage only when the insurer's conduct misleads the insured into believing that coverage exists and the insured takes action in reliance on that misrepresentation. *Harasyn v. St. Paul Guardian Ins. Co.*, 75 S.W.3d 696, 701–02 (Ark. 2002). Courts may not find restrictions from coverage void as against public policy unless the legislature has specifically prohibited a particular exclusion from coverage. *Id.* at 699. Regarding waiver and estoppel, the Arkansas Supreme Court has

> noted that coverage in a contract of insurance cannot be extended by waiver or estoppel. The doctrine of waiver or estoppel cannot be given the effect of enlarging or extending the coverage as defined in the

contract, nor can it create a contract of insurance, since a cause of action cannot be based on a waiver.

*Id*. at 702.

Here, McAninch has not alleged that KBS misrepresented that coverage existed and that Sinclair took action based on that misrepresentation. Furthermore, McAninch has not cited any statutory authority prohibiting any of the exclusions or limitations in the D&O Policy. McAninch, however, relies on *Delmar Bank of University City v. Fidelity & Deposit Co. of Maryland*, 428 F.2d 32 (8th Cir. 1970), to support his argument that KBS's letter of September 10, 2001, which purported to cancel both the D&O Policy and the crime bond, amounted to a general denial of all coverage, meaning that KBS waived all policy defenses and exclusions. In *Delmar*, we applied a *Missouri* rule of law which states that when an insurance company "denies liability on one basis it waives all defenses to the claim not asserted in [its] declination of payment." *Id*. at 35. The insurance company in *Delmar* initially declined liability on one basis and, after the insured filed suit for wrongful denial of coverage, attempted to raise another defense to dismiss the complaint after the case had been argued and submitted. *Id*.

Here, the district court applied Arkansas law to the claims, not Missouri law. No party on appeal has challenged the application of Arkansas law. Additionally, the present case is distinguishable from *Delmar*. KBS admittedly sent an *erroneous* cancellation letter but, one day later, sent a corrected notification stating that the D&O Policy would expire and not be renewed. Unlike in *Delmar*, KBS sent the corrected notification before Wintermute's attorney advised KBS that possible claims might be asserted by the FDIC against officers and directors of SNB and before McAninch filed suit against KBS. Accordingly, we find that the district court correctly concluded that KBS was entitled to raise all policy defenses asserted in its initial declination of coverage.

-23-

## D. *Tort Claim*

Wintermute challenges the district court's grant of summary judgment to KBS on her tort claim for malicious interference with a defense. She argues that the district court erred in reasoning that she suffered no compensable injury on her tort claim for KBS's deliberate concealment of exculpatory evidence—the crime-bond file—because the jury acquitted her of all counts covered by the insurance policy.[9] According to Wintermute, just because the insurance did not cover the two counts for which she was convicted does not mean that KBS did not injure her. She was prepared to prove at trial that, had KBS not deliberately frustrated her subpoena, she could have used the crime-bond file to prove her innocence on the two noncovered claims for which she was convicted.

The district court applied Missouri law to Wintermute's tort claim. Because no Missouri statute specifically recognizes a claim for malicious interference with a criminal defense, the district court treated the claim as a prima facie tort claim. The elements of a prima face tort under Missouri law are: (1) an intentional lawful act by the defendant; (2) intent to cause injury to the plaintiff; (3) injury to the plaintiff; and (4) an absence of any justification or an insufficient justification for the defendant's act. *Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo. App. 1980).

In Wintermute's second amended complaint, she alleged that:

KBS willfully and maliciously failed to produce documents subpoenaed by Wintermute's counsel, which would have assisted her in her defense of the *Covered Claims*, with the intention of seeking to assure Wintermute's conviction of the *Covered Claims* so that KBS would be

---

[9]Wintermute's theory is that KBS refused to comply with her criminal trial subpoena to produce the crime-bond file because it contained exculpatory evidence that KBS did not want produced because it wanted Wintermute convicted. If Wintermute had been convicted of the counts relating to her conduct as a bank director, KBS would have had no liability under the policy.

-24-

in a position to assert that it had no liability under the Insurance Policy. (Emphasis added).

As the district court noted, Wintermute's complaint *only* alleges that the documents would have assisted her in the defense of the "covered claims," i.e., those claims relating to actions she took as a director of SNB. She failed to allege that the documents would have assisted her in her defense of the noncovered claims. As a result, even if KBS intentionally frustrated Wintermute's efforts to obtain the subpoenaed file with the intent to injure her, Wintermute suffered no injury because she was acquitted of all counts for which insurance coverage was claimed.

Had Wintermute alleged in her complaint that the documents subpoenaed would have assisted in defense of all claims—covered and noncovered— her assertion that it is irrelevant whether she was insured for the two counts of conviction might have merit. However, we must treat the pleadings as written. Therefore, because Wintermute only alleged that the crime-bond file would have assisted her in her defense of the "covered claims," and because Wintermute was acquitted on all of the "covered claims," we hold that the district court did not err in granting summary judgment to KBS on Wintermute's tort claim.[10]

### E. *Motion for Reconsideration*

Wintermute's final argument on appeal is that the district court erroneously denied her motion for reconsideration of its grant of summary judgment to KBS on her tort claim. According to Wintermute, although she made known to the district court, immediately upon receipt of the crime-bond file, that her tort claim against KBS had broadened to include the two noncovered counts, she failed to brief this issue on

---

[10]Because we find that the district court properly granted summary judgment to KBS on Wintermute's prima facie tort claim, we will not consider KBS's alternative argument that Missouri law does not recognize the prima facie tort of malicious interference with a defense.

the then-pending summary judgment motion because, in moving for summary judgment, KBS did not argue that Wintermute suffered no injury; it only argued that it had no intent to injure Wintermute. Thus, she asserts that the district court improperly granted summary judgment against her on a ground not advocated by KBS. We review a district court's denial of a motion for reconsideration for an abuse of discretion. *In re Charter Communications, Inc.*, 443 F.3d 987, 993 (8th Cir. 2006).

While Wintermute asserts that KBS never raised the issue of lack of injury in its motion for summary judgment, page 11 of its motion states that "KBS asserts that elements 2, 3 and 4 [of the prima facie tort claim] are lacking in this case." As previously noted, the third element is "injury to the plaintiff." KBS thus challenged the existence of any injury to Wintermute. The district court did not raise this issue sua sponte, and we find that the district court did not abuse its discretion in denying Wintermute's motion for reconsideration.

## III. *Conclusion*

Accordingly, we reverse the district court's grant of summary judgment to KBS as to Wintermute's demand for coverage and remand for consideration of Wintermute's claim in accordance with this opinion. We affirm in all other respects.

_____