# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2806

_____

Susan Wintermute,                *
                                           *
            Appellant,           *
                                             *      Appeal from the United States
       v.                                *      District Court for the
                                             *      Western District of Missouri.
The Kansas Bankers Surety Co.,    *
                                             *            [PUBLISHED]
            Appellee.            *

_____

Submitted: June 17, 2010
Filed: January 6, 2011

_____

Before SMITH and HANSEN, Circuit Judges, and WEBBER,[1] District Judge.

_____

HANSEN, Circuit Judge.

Susan Wintermute, a former director of the Sinclair National Bank (SNB), appeals the district court's grant of summary judgment in favor of The Kansas Bankers Surety Co. (KBS) in this insurance policy dispute concerning whether a directors and officers (D&O) liability insurance policy obligated KBS to defend Wintermute in a criminal action brought against her as a director of SNB. Wintermute also appeals the district court's denial of her motion to amend the tort claim in her complaint against

_____

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri, sitting by designation.

KBS. We affirm the denial of the motion to amend the complaint, but we reverse and remand the district court's grant of summary judgment on the insurance contract claim, as genuine issues of material fact exist concerning whether two policy exclusions apply.

I.

This dispute returns to us following our previous opinion remanding the case to the district court, in which we affirmed the district court's dismissal of Wintermute's tort claim but reversed the district court's grant of summary judgment on the insurance contract claim. See McAninch v. Wintermute, 491 F.3d 759 (8th Cir. 2007). A detailed recitation of the underlying facts of the case can be found in our prior opinion, and we summarize the facts here as they relate to the instant appeal.

KBS provided a D&O liability policy to SNB for the relevant period of time. Susan Wintermute and her former husband, Damian Sinclair, were indicted on criminal charges for filing false statements in connection with their purchase of SNB in 2000 and for various bank fraud charges related to loans SNB subsequently purchased from two companies in which Wintermute and Sinclair held financial interests. Sinclair filed a civil action in state court against KBS on June 17, 2003, which KBS removed to the United States District Court for the Western District of Missouri on August 4, 2003, alleging that KBS had wrongfully refused to defend Sinclair against the criminal charges filed against him. Sinclair died prior to the criminal trial, and his estate was substituted as the plaintiff in this removed civil action on July 21, 2004. Wintermute joined the case as a plaintiff at the same time. Wintermute was convicted on August 24, 2004, of the two counts of the criminal indictment related to the false filings made by Wintermute and Sinclair associated with their purchase of SNB. Wintermute was acquitted of the four criminal counts related to fraudulent banking activities engaged in *after* the bank was purchased and while Wintermute was acting as a director.

Following the criminal trial and Wintermute's conviction on two of the six counts, Wintermute filed a second amended complaint in this action on October 19, 2004. The second amended complaint included a tort claim for malicious interference with Wintermute's criminal defense, alleging that KBS withheld exculpatory documents that her counsel had subpoenaed and that would have assisted in her defense of the four counts on which she was acquitted. These counts—referred to in the complaint as the "Covered Counts" under the policy—related to activity Wintermute allegedly engaged in as a director after the bank was purchased. The second amended complaint recognized that KBS's D&O coverage did not extend to the two criminal counts related to the preacquisition activity, as KBS only provided coverage to Wintermute as a director, a position she did not hold until after the acquisition of the Bank.

In March 2005, the district court ordered KBS to produce over 500 pages from its crime bond file related to SNB. The file contained copies of 17 assignments of loans purportedly signed by Wintermute. Five of the loans predated acquisition of SNB, and twelve were dated after the change in ownership and while Wintermute served as a director. According to Wintermute, the 17 documents contained clear forgeries of her signature. The crime bond file also contained a proof of loss filed by the Federal Deposit Insurance Corporation (FDIC) as receiver of SNB, naming only Sinclair as involved in criminal conduct. Wintermute believed the forged documents would have been crucial to her defense of the preacquisition counts on which she was convicted.

After receiving the documents, Wintermute filed a motion for leave to serve additional expedited discovery on March 30, 2005, arguing that the crime bond file would have exculpated her from criminal liability on all counts. The district court denied the motion. Wintermute also argued in her pretrial brief, filed on May 16, 2005, that she intended to prove at the trial of this case that she would have been acquitted on all counts if KBS had not wrongfully and intentionally withheld the

crime bond file. The district court granted summary judgment to KBS on May 25, 2005, obviating the need for a trial. Wintermute filed a motion for reconsideration, again arguing that she was prepared to amend her pleadings at trial to conform to the evidence of the crime bond file and to include a tort claim concerning both the covered counts and the noncovered counts, but she never actually moved to amend the complaint. The district court denied the motion for reconsideration the same day.

Wintermute appealed to this court on June 29, 2005, and we affirmed in part and reversed in part. See McAninch, 491 F.3d at 775. We held that the policy did not limit its coverage to claims relying solely on a director's status, and we reversed the summary judgment that had been granted on this basis, remanding the insurance contract claim. Id. at 770-72. We affirmed the district court's conclusion that exclusion 3, related to claims brought by regulatory agencies, did not preclude coverage for criminal charges brought by the United States. Id. at 772. We also affirmed the dismissal of the malicious interference tort claim and the district court's denial of Wintermute's motion for reconsideration. Id. at 774-75.

After the case was remanded, Wintermute filed a motion in the district court to amend her complaint to add an allegation to her malicious interference tort claim that the withheld crime bond file would have aided in the defense of the noncovered counts, for which she suffered an injury—conviction. The district court denied the motion to amend based on the doctrines of *res judicata* and the law of the case. The district court again granted summary judgment in favor of KBS, concluding that Wintermute could not establish that she suffered a "loss" for purposes of coverage. It held in the alternative that two exclusions precluded coverage in any event. Wintermute appeals the denial of her motion to amend and the grant of summary judgment.

II.

We normally review the district court's denial of leave to amend a complaint for abuse of discretion. To the extent the district court's denial was based on the legal doctrines of *res judicata* and the law of the case, we review the application of those doctrines *de novo*. See Zutz v. Nelson, 601 F.3d 842, 850 (8th Cir. 2010). We review the grant of summary judgment on the insurance claim *de novo*, applying the same standard applied by the district court and utilizing state law to determine the insurance coverage issues. See Country Life Ins. Co. v. Marks, 592 F.3d 896, 899 (8th Cir. 2010).

A.    Motion to Amend Tort Claim

In the first appeal of this case, we "reverse[d] the district court's grant of summary judgment to KBS as to Wintermute's demand for coverage," but "[w]e affirm[ed] in all other respects," McAninch, 491 F.3d at 775, including the dismissal of the tort claim. Following remand, the district court rejected Wintermute's motion to amend the dismissed tort claim based on the doctrines of *res judicata* and the law of the case.

"Under *res judicata*, a judgment on the merits in an earlier lawsuit bars a second suit involving the same parties based on the same cause of action." Prof'l Mgmt. Assocs., Inc. v. KPMG LLP, 345 F.3d 1030, 1032 (8th Cir. 2003). The requirements for application of *res judicata* are: 1) a final judgment on the merits, 2) based on proper jurisdiction, 3) between the same parties, and 4) based on the same claims or causes of action. Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs., 533 F.3d 634, 639 (8th Cir. 2008). The first requirement is met because *res judicata* applies to all final claims, even if other claims within a case remain alive. See Lair v. Oglesby, 14 F.3d 15, 17 n.2 (8th Cir. 1993) ("*[R]es judicata* can apply to prevent reassertion of dismissed claims, even though there remain live claims in the same

litigation"); Restatement (Second) of Judgments § 13, comment e (1982) (judgment may be final as to part of an action or claim, with action continuing as to rest). There is no dispute that the district court reached the merits of the tort claim and this court affirmed the merits of that disposition, making the dismissal of the tort claim final. Neither do the parties dispute jurisdiction or that the prior judgment involved the same parties. As for the last requirement that the prior judgment involve the same causes of action, a prior judgment binds a party "'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" Yankton Sioux Tribe, 533 F.3d at 640 (quoting Comm'r v. Sunnen, 333 U.S. 591, 597 (1948)). Wintermute received the crime bond file on March 16, 2005, over two months before the district court granted summary judgment to KBS on the tort claim. Wintermute did not formally attempt to amend her malicious interference claim to allege that KBS interfered with her defense of the noncovered counts until over two years later, after our opinion in the appeal of that judgment.[2] The district court's judgment therefore covers a tort claim related to the noncovered counts, as those could have been included in the original claim but were not.

Because the doctrine of *res judicata* would have foreclosed the claims Wintermute sought to add to her complaint, any amendment would have been futile.[3] The district court therefore did not abuse its discretion in denying Wintermute leave

---

[2]Wintermute asserted in her motion for reconsideration in the district court that she was prepared to amend her complaint to include the noncovered criminal counts in her malicious interference claim, but she did not at that time request to amend it. Thus, the claims were informally before the district court in the motion it denied and we affirmed.

[3]The law of the case doctrine would also foreclose Wintermute's attempt to restate her previously dismissed tort claim. See Lair, 14 F.3d at 16-17 (affirming district court's dismissal of amended complaint based on law of the case where the dismissal of the original claim was affirmed in a previous appeal).

-6-

to amend her complaint.  See Popoalii v. Corr. Med. Servs., 512 F.3d 488, 497 (8th Cir. 2008) (motion to amend complaint properly denied if amendment would be futile).

B.    Contract Claim

The parties agree that interpretation of the insurance policy in this diversity case is governed by Arkansas substantive law.  See Murray v. Greenwich Ins. Co., 533 F.3d 644, 648 (8th Cir. 2008).  Under Arkansas law, the meaning of an insurance policy is a legal issue for the court.  See McGrew v. Farm Bureau Mut. Ins. Co. of Ark., Inc., 268 S.W.3d 890, 896 (Ark. 2007).  In construing insurance contracts, Arkansas courts "read the whole document together and determine whether all parts are in harmony.  If possible [Arkansas law] give[s] effect to the overall meaning of the contract.  It is error to give effect to one clause over another on the same subject if the two clauses are reconcilable."  Travelers Indem. Co. v. Olive's Sporting Goods, Inc., 764 S.W.2d 596, 599 (Ark. 1989).  "A basic [tenet] of contract law is that each word in the agreement should be interpreted to have a meaning, rather than to be redundant and superfluous."  Jones v. Sun Carriers, Inc., 856 F.2d 1091, 1095 (8th Cir. 1988) (applying Arkansas law).

The district court granted summary judgment to KBS on the insurance contract claim based on its determination that Wintermute had not had a "claim for Loss" made against her as a director, and therefore coverage had not triggered.  The coverage provision of the policy at issue provides: "The Underwriter [KBS] . . . agrees: (A) to indemnify each and every person who was, [or] now is . . . a Director . . . for personal Loss which the Director . . . is legally obligated to pay by reason of any Wrongful Act solely in their capacities of Director . . . which is first Discovered during the Policy Period."  (Add. tab 1 at 13.)  The term "Loss" is defined in the policy.  "'Loss' . . . (A) shall mean any amount which the Directors . . . are legally obligated to pay . . . for a claim . . . made against the Directors . . . for Wrongful Acts and shall include but not

be limited to damages, judgments, . . . and defense of legal claims . . . ."  (Id. at 14.) Using that definition in the coverage provision, the policy provides coverage for any amount a director is legally obligated to pay for a claim made against the director for a wrongful act.

KBS argues that there is no coverage because a condition precedent to coverage is a "claim for Loss," and a criminal charge is not a claim for an amount Wintermute is legally obligated to pay.  The district court also focused its discussion of the coverage issue on a "claim for Loss."  It reasoned that a "claim," which was not defined in the policy, is a demand for money or something owed.  Because a criminal indictment, absent a count for restitution, is not a demand for money, the district court determined that Wintermute did not have a claim for Loss made against her to trigger KBS's obligation to defend or indemnify her under the policy.[4]

The problem with the district court's and KBS's reasoning is that the plain language of the policy provides coverage for Loss a director is obligated to pay for a claim made against a director *for a wrongful act*.  The coverage language does not preface coverage on a claim for Loss, only a claim for a wrongful act.  The parties do not dispute that the criminal actions alleged in Wintermute's criminal case are claims against Wintermute for a wrongful act, nor do they dispute that the attorney's fees she expended in defending herself are an amount she is legally obligated to pay stemming

---

[4]In so concluding, the district relied, in part, on a statement made by this court in its first opinion that "the criminal prosecution of Wintermute did not involve a claim for 'Loss.'"  (Add. tab 3 at 15.)  The district court also found persuasive a district court decision cited in that opinion, St. Paul Fire & Marine Ins. Co. v. Genova, 172 F. Supp. 2d 1001, 1005 (N.D. Ill. 2001), which concluded that a criminal indictment seeking forfeiture was not a claim under a D&O Policy.  As noted by the district court, however, the prior panel vacated its original opinion and replaced it with an opinion that did not include the quoted language above.  The substituted opinion likewise excluded the vacated opinion's citation to the Genova case.  The district court should not have relied on those statements from the first, vacated panel opinion.

-8-

from that claim for a wrongful act. Therefore, for coverage purposes, the covered counts of the criminal indictment are claims for a wrongful act against Wintermute, and KBS must indemnify Wintermute for any Loss she is obligated to pay by reason of the criminal indictment. See Polychron v. Crum & Forster Ins. Cos., 916 F.2d 461, 463 (8th Cir. 1990) (construing a materially indistinguishable D&O policy under Arkansas law and holding that "the grand jury's investigation and the questioning by the Assistant United States Attorney amounted, as a practical matter, to an allegation of wrongdoing" against the insured bank officer).

Having found coverage, we must turn to the exclusion provisions to see if any one of them precludes coverage for the legal expenses incurred with respect to the acquitted counts. The policy includes a prefatory statement to the exclusion provisions that provides: "[KBS] shall not be liable to make any payment or provide any defense in connection with any claim for Loss made against the Bank or Directors . . . ." (Add. tab 1 at 15.) It then goes on to list several types of excluded claims. Wintermute argues that none of the exclusions can apply because there is not a "claim for Loss" made against her, only criminal misconduct charges of which she was acquitted. Wintermute's argument is the inverse of KBS's previous argument on the coverage issue—where KBS argued that there is no coverage absent a "claim for Loss," Wintermute argues that none of the exclusions apply because there must first be a "claim for Loss" as stated in the prefatory language before any one of the exclusions is triggered.

In contrast to KBS's argument on the coverage issue, Wintermute's argument is based on a phrase that does exist in the exclusion section's prefatory language—"claim for Loss." Wintermute argues that the exclusion provisions apply only to "claims for Loss" made against a director, and a criminal indictment is not a claim for Loss because the claim (the criminal indictment) does not seek an amount owed by the director. However, if we substitute the policy definition of "Loss" into the exclusion provision language, it would read: "[KBS] shall not be liable to make

any payment or provide any defense in connection with any claim for 'any amount which the Directors . . . are legally obligated to pay . . . for a claim . . . made against the Directors . . . for Wrongful Acts and shall include . . . defense of legal claims' made against the . . . Directors."  In other words, coverage is excluded for a claim for any amount a director is legally obligated to pay for a claim against the director for a wrongful act made against the director that falls within one of the enumerated types of exclusions.  The claim for Loss is different than the claim for a wrongful act.  The attorney's fees associated with Wintermute's criminal defense of the acquitted counts (the covered counts) are a claim for an amount she is legally obligated to pay related to a claim against her for a wrongful act.  See Polychron, 916 F.2d at 463-64 (holding that attorney's fees incurred in aid of a criminal defense fell within the definition of "Loss" contained in the policy under a similar definition as the definition of "Loss" used here).

Although the prefatory exclusion provision uses the term "claim for Loss" and the coverage provision does not, substitution of the contract's definition of Loss into the prefatory exclusion provision makes clear that the exclusion provision's prefatory language is meant to mirror the coverage provision, so that the prefatory language does nothing more than state there is no coverage under the policy if one of the enumerated exclusions applies.  This interpretation "give[s] effect to the overall meaning of the contract," reconciling the two clauses, see Travelers Indem. Co., 764 S.W.2d at 599, and is consistent with the prior panel opinion, see McAninch, 491 F.3d at 769 ("The district court's construction of this contract fails to harmonize—or for that matter acknowledge—the language which expressly provides coverage (subject to various exclusions) for actual or alleged wrongful acts."); id. at 772 ("Had KBS intended to exclude from coverage any and all costs or losses or attorneys fees arising out of or attendant to any criminal charge made against its insured, a simple declarative sentence could have been easily inserted into the policy.").

1.      Personal Profit Exclusion

"Once it is determined that there is coverage, it must be determined whether the exclusionary provisions in the policy eliminate coverage." Smith v. Farm Bureau Mut. Ins. Co. of Ark., Inc., 194 S.W.3d 212, 218 (Ark. Ct. App. 2004). The general requirements that the insurance terms must be expressed in clear and unambiguous language apply equally to exclusions. Id. Unambiguous language controls, but if the language is found to be ambiguous, then the rules of construction—including that contracts are read against the insurer who prepared the policy—apply. Id. at 218-19. If the policy can reasonably be construed to justify recovery, or if the policy language is susceptible to two interpretations, the court must adopt the interpretation most favorable to the insured. Id. at 219.

The district court concluded that exclusion 2 and exclusion 11 each precluded coverage for Wintermute's attorney's fees related to the criminal case. Exclusion 2 provides that KBS shall not be liable for payment or defense of any claim for Loss made against a Director "based upon or attributable to the Director[] . . . gaining in fact any personal profit or advantage to which [she was] not legally entitled." (Add. tab 1 at 15.) The district court concluded that even if the policy provided coverage, this "personal profit" exclusion would apply to deny coverage, rejecting Wintermute's argument that her acquittal shows that she did not "gain[] in fact" any personal profit.

The pleadings against the insured, no matter how groundless, false, or fraudulent the pleadings may be, determine an insurer's duty to defend. That duty "arises where there is a possibility that the injury or damage may fall within the policy coverage." Madden v. Cont'l Cas. Co., 922 S.W.2d 731, 734 (Ark. Ct. App. 1996). The district court relied on this rule of law to conclude that it could look only at the allegations in the complaint to determine whether KBS had a duty to defend and that those allegations fell squarely within the personal profit exclusion. According to the

district court, the eventual outcome of the underlying lawsuit is irrelevant if the allegations of the complaint fall within the exclusionary language.

While *coverage* is determined based on the allegations in the complaint, we are dealing here with an *exclusion* issue, not with a coverage issue. See id. (addressing a fraud exclusion and concluding that questions of fact as to whether the policy exclusions actually applied precluded summary judgment). "Absent absolute clarity on the face of the complaint that a particular policy exclusion applies, there exists a potential for coverage and an insurer cannot justifiably refuse to defend." Lorenzo v. Capitol Indem. Corp., 928 N.E.2d 1274, 1278 (Ill. Ct. App. 2010) (internal marks omitted).

The district court's analysis ignores the term "in fact" contained in the personal profit exclusion. Under Arkansas law, contracts are to be construed as a whole, and all terms of a contract should be given meaning. See Travelers Indem. Co., 764 S.W.2d at 599. Review of the exclusionary provisions of the KBS policy reveals that other exclusions apply wholesale to all allegations of a particular class. For example, the policy excludes coverage for claims "*involving* political contributions of any kind," "*involving* sexual, racial, religious, or age discrimination or harassment," or "*involving* allegations of racketeering activity as defined in [18 U.S.C. § 1961]." (Add. tab 1 at 15, exclusions 5-7 (emphasis added).) If the policy was intended to exclude all claims merely alleging a personal profit, it could have used a similar format as exclusions 5, 6, and 7 do and defined the exclusion as applying to a claim "involving" illegal personal profits. But it does not; it defines the exclusion as "based upon or attributable to the Directors . . . gaining in fact any personal profit . . . to which they were not legally entitled." (Id. at 15, exclusion 2 (emphasis added).) We believe the phrase "gaining in fact" must have some meaning, and relying solely on the allegations of a personal gain contained in the complaint reads that phrase out of the insurance contract. See PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co., No. C-02-1774, 2006 WL 825266, at *5-6 (N.D. Cal. Mar. 29, 2006) (unpublished)

-12-

(noting that the "in fact" language did not appear in all the exclusions, such that the phrase had to mean something in the personal profit exclusion).

The district court noted a conflict of authority over whether exclusion provisions using the term "in fact" require the court to look beyond the face of the complaint. The district court followed the Seventh Circuit, see Brown & LaCounte, L.L.P. v. Westport Ins. Corp., 307 F.3d 660, 663 (7th Cir. 2002) (rejecting, as contrary to Wisconsin law, an interpretation of a gaining-in-fact-personal-profit exclusion that would require a defense until the allegations of personal profit were proved), which concluded that if an insurer had to await the outcome of the underlying litigation to determine whether the director "in fact" gained a personal profit, it would always have to defend the director, eviscerating the exclusion. The Seventh Circuit concluded that a personal gain exclusion applies to the whole class of claims, at least where the underlying complaint unequivocally and directly alleges a personal gain by the insured. Id. at 664.

An opposing line of cases concludes that the term "in fact" must have some meaning. See PMI Mortg. Ins., 2006 WL 825266, at *5-6 (concluding that there must be some determination of fact before an identical personal profit exclusion could be applied in order to give effect to the plain and ordinary meaning of the term "in fact," particularly where the actual illegality of the alleged gain was in dispute); St. Paul Mercury Ins. Co. v. Foster, 268 F. Supp. 2d 1035, 1045-46 (C.D. Ill. 2003) (relying on rules that all policy provisions should be given meaning and that interpretations rendering any part of the contract superfluous should be avoided to conclude that mere allegations of an improper personal profit were insufficient to trigger policy exclusion without further fact development). We agree with this line of cases. The term "in fact" means "actual or real" or "resulting from the acts of parties rather than by operation of law." Pendergest-Holt v. Certain Underwriters at Lloyd's of London, 600 F.3d 562, 570-71 (5th Cir. 2010) (quoting Black's Law Dictionary 792 (8th ed. 2004)). To give effect to its meaning, the insurer cannot deny a defense based solely on the

allegations in the complaint unless the facts are uncontested. Whether an insured in fact gained a personal profit is a fact issue that must be decided by a trier of fact if the relevant evidence is disputed. Cf. TIG Specialty Ins. Co. v. Pinkmoney.com Inc., 375 F.3d 365, 371 (5th Cir. 2004) (looking at the state court jury findings that determined that a director did not actually benefit from his misrepresentations to conclude that coverage concerning a securities fraud claim brought solely against that director would not be excluded under a similar personal profit exclusion); Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 197 F.3d 742, 747 (5th Cir. 1999) (reviewing for clear error the district court's factual determination, made during a bench trial, of whether an insured actually gained a personal profit).

We reject KBS's claim that looking beyond the allegations in the complaint will result in a final adjudication requirement even though the policy contains no such requirement. As noted by the Fifth Circuit, "in fact" language is generally read more broadly than a "final adjudication" clause and can be satisfied by a "final decision on the merits in either the underlying case or a separate coverage case, or an admission by the insured." Pendergest-Holt, 600 F.3d at 573. Thus, while "in fact" language does not require a final adjudication in the underlying case, it should include "at a minimum, at least some evidentiary proof that the insured reaped an illegal profit or gain." PMI Mortg. Ins. Co., 2006 WL 825266, at *7.

Even the facts alleged in the indictment do not unequivocally assert that Wintermute illegally gained a personal profit. As related to the covered counts, the criminal indictment charged Wintermute with illegal participation, misapplication of bank funds, and bank fraud. The facts supporting the charges in the indictment related to the covered counts alleged that she and her husband failed to disclose to the Comptroller of the Currency (OCC) their financial relationship with Sinclair Management Services and with Stevens Financial Group and used their positions as bank directors to cause SNB to buy several million dollars worth of loans from Stevens Financial Group without disclosing their interest in the loans to the other

directors and in violation of federal lending limits. The indictment further charged that the purchase of Wintermute's home was funded by Stevens Financial Group after Clarence Stevens obtained funds from SNB. It also alleged that Stevens Financial Group paid Wintermute more than $300,000 over a one-year period.

Missing from the facts stated in the indictment is an allegation that Wintermute received a personal gain to which she was not legally entitled. See Alstrin v. St. Paul Mercury Ins. Co., 179 F. Supp. 2d 376, 400-01 (D. Del. 2002) (concluding that securities fraud allegations did not fit within a personal gain exclusion where at most the allegations alleged a gain as a side benefit but did not allege that the gain was itself illegal, focusing on the elements of the underlying cause of action). The Seventh Circuit in Brown distinguished cases involving "allegations of breaches of fiduciary duty where the dispute concerned the illegality of the actions taken or profits received." Brown, 307 F.3d at 664; see also Am. Chem. Soc'y v. Leadscope, Inc., No. 04AP-305, 2005 WL 1220746, at *12 (Ohio Ct. App. May 24, 2005) (distinguishing Brown and noting that "there remains a question of whether any conversion, in fact, took place. Only if a conversion actually took place would the profits derived from appellees' patent be deemed illegal."). By contrast, Brown involved direct and unequivocal allegations that Brown reaped an illegal profit by billing a client for legal services provided under an illegal contract.

In Homebank of Ark. v. Kan. Bankers Sur. Co., No. 4:06cv1670, 2008 WL 2704670 (E.D. Ark. July 7, 2008), the district court denied summary judgment to KBS on its claim that it did not have a duty to defend a bank president against a claim of fraudulent inducement resulting in an improper benefit to the bank president, where KBS relied on the same personal profit exclusion at issue in this case. The court noted that the duty to defend arose from the possibility of coverage. Id. at *7. In later denying KBS's motion for reconsideration, the court further explained its rationale that KBS had a duty to defend the bank president against the fraudulent inducement and related claims because there was "a possibility, however remote, that the to-be-

established facts will show that the personal profit and dishonesty exclusions do not apply." Homebank of Ark. v. Kan. Bankers Sur. Co., No. 4:06-1670, slip op. at 3-4 & n.2 (E.D. Ark. Aug. 28, 2008). We conclude that the Arkansas courts would follow the line of cases giving meaning to the term "in fact" and would require at least some evidence that the insured actually received a personal gain to which she was not legally entitled before allowing the insurer to deny a defense. See Madden, 922 S.W.2d at 734. The district court erred in granting summary judgment based on the personal profit exclusion by relying solely on the allegations in the indictment.

2.    Dishonesty Exclusion

Exclusion number 11 provides that KBS shall not be liable to make payment or provide any defense in connection with any claim for Loss against a Director "brought about or contributed to by the dishonesty of the Directors . . . .  This exclusion shall not apply to any protection provided for any Director . . . under the terms of this policy who was not involved in the dishonest acts." (Add. tab 1 at 15.) The district court applied a similar analysis to the dishonesty exclusion as it did to the personal profit exclusion, looking at the allegations in the indictment to determine whether the exclusion was triggered, and concluded that "[c]learly the dishonesty exclusion applies in this case" (Add. tab 3 at 26) because counts 4 and 6 alleged that Wintermute acted with the intent to defraud and counts 7 and 8 alleged bank fraud. Notably, the district court did not discuss the last sentence of the exclusion, which makes the exclusion inapplicable to a director not involved in the dishonest acts.

We conclude that the last sentence of the dishonesty exclusion serves the same purpose as the "in fact" language contained in the personal profit exclusion. The last sentence must be given some meaning, see Travelers Indem. Co., 764 S.W.2d at 599, and by its ordinary language, it makes the dishonesty exclusion inapplicable if the specific director was not actually involved in the dishonest acts. Thus, it is not enough that the criminal indictment charged Wintermute with committing fraud.

-16-

Material fact disputes exist concerning whether Wintermute "was involved in the dishonest acts" alleged, particularly in light of her acquittal on those counts. Cf. Polychron, 916 F.2d at 464 (noting the policy did "not exclude attorney's fees incurred in defense of a criminal matter, at least where the insured is acquitted"). The district court therefore erred in granting summary judgment to KBS under the dishonesty exclusion based solely on the allegations contained in the criminal indictment.

III.

Because the district court improperly considered only the allegations in the complaint in determining that the exclusions applied, and because issues of material fact remain concerning whether Wintermute in fact received a personal gain to which she was not entitled or whether Wintermute was involved in any dishonest acts, we reverse the district court's grant of summary judgment and remand for further proceedings. That Wintermute was acquitted on the covered charges does not necessarily determine that the exclusions do not apply, as a criminal conviction requires proof beyond a reasonable doubt on each of the elements of the underlying offense. That, however, is a separate issue from whether, for purposes of a duty to defend, KBS can establish that the personal profit or dishonesty exclusions apply. Cf. Zinger v. Terrell, 985 S.W.2d 737, 741-42 (Ark. 1999) ("A criminal acquittal for murder where the proof does not convince a jury beyond a reasonable doubt should not prohibit a civil trial where proof of wrongdoing may well be proved by a preponderance of the evidence."). "Although our decision here may result in a retrial of essentially the same facts, the specific issues of policy coverage must be determined by a jury or trier of fact as the facts deciding those issues remain in conflict." Morris v. Valley Forge Ins. Co., 805 S.W.2d 948, 951 (Ark. 1991) (reversing summary judgment granted in favor of insurer where trial court had relied on verdict against attorney/insured in underlying malpractice case; facts before the court in the coverage case were in dispute).

-17-

The district court's judgment denying Wintermute's motion to amend is affirmed, and its summary judgment in favor of KBS on Wintermute's contract claim is reversed. The case is remanded for further proceedings consistent with this opinion.

_____