# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3472

_____

|  |  |  |
|---|---|---|
| U.S. Bank National Association, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Federal Insurance Company; Old | * | |
| Republic Insurance Company; National | * | |
| Union Fire Insurance Company of | * | |
| Pittsburgh; Twin City Fire Insurance | * | |
| Company; XL Specialty Insurance | * | |
| Company; RLI Insurance Company, | * | |
| | * | |
| Defendants-Appellees. | * | |

_____

Submitted: May 11, 2011
Filed: December 13, 2011

_____

Before MELLOY and SMITH, Circuit Judges, and GRITZNER,[1] District Judge.

_____

MELLOY, Circuit Judge.

U.S. Bank National Association, as trustee for a creditors' trust (the "Trust"), holds a $56 million stipulated judgment against Paul Yarrick, a former officer of

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

Interstate Bakeries, Inc. ("Interstate"). Interstate has emerged from a voluntary Chapter 11 bankruptcy reorganization. In the bankruptcy proceedings, the Trust obtained the right to bring the action that later resulted in the judgment against Yarrick. The Trust received this right in exchange for certain concessions, including an agreement to execute only against potentially liable insurers. After the Trust obtained the judgment against Yarrick, the Trust brought the present action against the above-named insurance company defendants in an attempt to collect against several director and officer policies that named Yarrick as an insured. The district court[2] granted summary judgment in favor of the insurers, finding no coverage. We affirm.

I

The Trust alleges, and alleged in its earlier suit against Yarrick, that Yarrick committed misdeeds while an officer of Interstate, indirectly causing Interstate to lose approximately $170 million. According to the Trust, Yarrick's misdeeds led, eventually and in part, to Interstate's bankruptcy. For present purposes, we may assume these allegations to be true.

In bankruptcy, Interstate assigned certain assets and rights to the Trust established for the benefit of general creditors, including Interstate's claims against Yarrick. In exchange, the creditors agreed to otherwise release Interstate from liability. In order to make this transfer of rights possible, the creditors agreed to seek eventual satisfaction of any resulting judgment against Yarrick only from director and officer insurance policies and not to seek satisfaction against Yarrick's personal assets. A court order from the bankruptcy proceedings anticipated written agreements to carry out these purposes, and after court approval of the plan, the creditors and Interstate

---

[2]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

entered into separate agreements to satisfy these terms of the plan, including an "Assignment Agreement."[3]

After the parties entered into these agreements, the Trust sued Yarrick. Yarrick tendered the suit to Federal Insurance Company ("Federal"),[4] and Federal denied coverage for several reasons. First, Federal alleged that the underlying wrongful acts did not fall within the period of time covered by the policy. Second, Federal cited an insured-vs.-insured exclusion in the policy. According to Federal, because the Trust could, at most, stand in the shoes of Interstate, any claim by the Trust was merely a claim by Interstate against its own officer and was, therefore, barred as a claim against an insured by an insured. Third, Federal argued that the policy defined "Loss" to mean "the total amount which any Insured Person becomes legally obligated to pay on account of each Claim and for all Claims in each Policy Period . . . ." According to Federal, because the pre-suit Assignment Agreement completely shielded Yarrick from a potential legal obligation to pay any future judgment in favor of the Trust,

---

[3]The bankruptcy court's order provided, ". . . in connection with the transfer of D&O Claims as contemplated hereby, the documents evidencing such transfer . . . will contain an agreement of the Creditors' Trust that it will not seek satisfaction of or execute on any judgment that may be rendered in its favor against any of the Debtor's former directors' and officers' assets excluding insurance or contractual rights that they may have to have such losses paid or indemnified by insurance." The Assignment Agreement entered into by Interstate and the Trust after plan approval provided,"The Creditors' Trust shall not seek satisfaction of or execution on any judgment that may be rendered in its favor on a D&O Claim against any of the Potential Defendant's assets, other than from insurance or contractual rights that the Potential Defendant may have to have such losses paid or indemnified by insurance."

[4]The policies at issue included a $25 million primary policy issued by Federal and several excess policies in sequential layers of coverage issued by the other insurance company defendants resulting in a combined total of $85 million in insurance. According to the parties, the excess policies were follow-the-form policies, and no party makes arguments based upon policy language other than the language contained in Federal's primary policy.

there could be no compensable Loss and therefore, there was no coverage. Fourth, Federal cited an endorsement to the policy that further defined Loss as excluding "any amount not indemnified by the Insured Organization for which the Insured Person is absolved from payment by reason of any covenant, agreement, or court order." Finally, Federal alleged that the underlying assignment of the cause of action against Yarrick from Interstate to the Trust in the bankruptcy occurred without Federal's consent and therefore violated a consent provision in the policy.

Regarding defense costs, the parties agree the policy included no duty to provide a defense. The policy did, however, include "Defense Costs" as an element of "Loss" for "Covered Claims." The policy did not include defense costs regarding uncovered claims, however, and the policy contained specific provisions calling for the allocation of defense costs between covered and non-covered claims in the event an insured defended itself against a combination of covered and non-covered claims. In response to Yarrick's tender of the suit, Federal stated that because Yarrick faced no possible liability he had no reason to incur defense costs.

Upon receiving this response from Federal, Yarrick entered into a mediated settlement agreement (the "Settlement Agreement") with the Trust that resulted in the $56 million stipulated judgment. Yarrick entered into the Settlement Agreement without filing an answer to the Trust's complaint, and the record does not reveal a basis for the $56 million figure, other than language in the Settlement Agreement by which the Trust and Yarrick state that the amount is reasonable. In the Settlement Agreement, the Trust again agreed not to seek satisfaction of the judgment from Yarrick or from any of his assets other than the insurance policies.[5]

_____

[5]The Settlement Agreement between Yarrick and the Trust included a "Covenant Not to Execute" that provided:

The Parties agree that if the Court enters the Judgment, the Trust will not levy execution by garnishment, attachment, or in any other manner

-4-

After Yarrick and the Trust entered into the Settlement Agreement, the Trust commenced the present action against the insurers. The insurers moved to dismiss the Trust's complaint, asserting the insured-vs.-insured exclusion as well as the policy's definitions of Loss as grounds for denying coverage.

Regarding the insured-vs.-insured exclusion, the Trust argued that the policy included an endorsement containing a bankruptcy exception to the exclusion. According to the Trust, this exception applied to permit a suit by a bankruptcy-related entity such as the Trust. Regarding the definition of Loss, the Trust argued in the alternative that (1) there was coverage under the plain language of the policies, and (2) Federal was estopped from denying coverage because Yarrick was an abandoned insured who, as a matter of law, was entitled to enter into the Settlement Agreement to protect himself from a judgment after having been informed by Federal that there would be no defense or coverage.

The district court held that the bankruptcy exception to the insured-vs.-insured exclusion applied such that the exclusion did not preclude coverage.[6] The district court also held that the agreements in bankruptcy not to seek satisfaction of any judgment from Yarrick absolved Yarrick from payment before the Trust filed suit such that there could be no Loss as defined in the policy. In reaching this conclusion, the district court noted that, if the definition of Loss had not included the language "absolved from payment by reason of any covenant, agreement, or court order" and instead had only involved the language "legally obligated to pay" there might have

provided by law against any of Defendant's assets, except that the Trust may seek to satisfy the Judgment by any lawful means against the proceeds of the D&O Policies that provide coverage for the claims asserted in the U.S. Bank Lawsuit.

[6]For the reasons discussed below, we find a lack of coverage on other grounds and need make no comment regarding interpretation and application of the insured-vs.-insured exclusion or the bankruptcy exception.

been coverage. The court noted a split among various jurisdictions regarding application of the language "legally obligated to pay" in the context of agreements not to execute. The court concluded, however, that the additional policy language "absolved from payment by . . . agreement" was clear and applied to exclude the possibility of a Loss, given the pre-suit Assignment Agreement from the bankruptcy proceedings.

Finally, the district court rejected the Trust's abandoned-insured theory for two reasons. First, the court determined the policy was not a duty-to-defend policy, and, as such, coverage could not arise by estoppel based upon a theory that the insurers failed to satisfy a duty owed to Yarrick. Second, the court determined that Missouri law does not allow a claimant to use an abandoned-insured theory to create coverage where coverage would not otherwise exist. Regarding this second explanation, the court noted that the Trust's prayer for relief did not seek reimbursement of defense costs, but rather, sought coverage for the $56 million judgment. We address the Loss-definition and the abandoned-insured arguments below and conclude that the district court correctly dismissed the Trust's complaint.

II

A. Loss

The insuring clauses of the policy limit coverage to "Loss for which . . . the Insured Person becomes legally obligated to pay on account of any Claim . . . for a Wrongful Act . . . ." The policy defines "Loss" as "the total amount any Insured Person becomes legally obligated to pay on account of each Claim and for all Claims . . . for Wrongful Acts." The definition of Loss includes "Defense Costs" but "does not include . . . any amount not indemnified by the Insured Organization for which the Insured Person is absolved from payment by reason of any covenant, agreement or court order . . . ."

-6-

We previously addressed the impact of an agreement not to execute when interpreting the policy language "legally obligated to pay." See Freeman v. Schmidt Real Estate & Ins., Inc., 755 F.2d 135, 137–39 (8th Cir. 1985). In Freeman, we noted a split of authority as to whether an insured is "legally obligated to pay" an amount covered by an agreement not to execute. Id. (collecting cases). In general, courts disagree as to whether agreements not to execute should be interpreted as releases wholly eliminating insureds' legal obligations to pay or merely as contracts giving insureds the right to sue for breach in the event of attempted execution. Compare State Farm Mut. Auto. Ins. Co. v. Paynter, 593 P.2d 948, 953 (Ariz. Ct. App. 1979) ("[T]he covenant not to execute is not a release which would permit the insurer to escape its obligations.") with Stubblefield v. St. Paul Fire & Marine Ins. Co., 517 P.2d 262, 264 (Or. 1973) (en banc) (holding that where an insured and an assignee of the insured's rights against an insurer entered into a "Covenant not to execute," the insured was not "legally obligated to pay" amounts covered by the covenant and, therefore, the assignee could not recover those amounts from the insurer).[7]

Freeman involved Iowa law, and in an attempt to predict how that state's highest court would rule, we held an agreement not to execute eliminated the insured's legal obligation to pay and, therefore, removed the dispute from coverage. See Freeman, 755 F.2d at 139 ("Iowa courts would read the 'legally obligated to pay' policy language to protect insurers when their insureds are protected by prejudgment covenants not to execute."). Subsequently, however, the Iowa Supreme Court addressed the same issue, rejected our prediction, and held an agreement not to execute did not preclude coverage. See Red Giant Oil Co. v. Lawlor, 528 N.W.2d

---

[7] In Freeman, we cited Metcalf v. Hartford Accident & Indemn. Co., 126 N.W.2d 471, 476 (Neb. 1964), to note that some courts finding liability on the part of insurers rely on "some element of misconduct by the insurer." Freeman, 755 F.2d at 138. We believe this misconduct-based theory of liability presents an issue separate from the policy-interpretation issue of defining the phrase "legally obligated to pay." We address the misconduct-based theory of liability separately, in section II.B. below.

-7-

524, 532–33 (Iowa 1995) (distinguishing a covenant from a release and finding a legal obligation to pay remains even if an insured would have a right to bring a breach of contract action in the event of an attempted execution).

In the present case, the parties agree that Missouri law applies. Missouri's Supreme Court has not addressed this question, and we have not had occasion to address it when applying Missouri law. The split discussed in <u>Freeman</u> and <u>Red Giant</u> remains. <u>See, e.g.</u>, <u>State Farm Fire and Cas. Co. v. Gandy</u>, 925 S.W.2d 696, 719 (Tex. 1996) (rejecting <u>Red Giant</u>); <u>Nunn v. Mid-Century Ins. Co.</u>, 244 P.3d 116, 123 (Colo. 2011) (citing <u>Red Giant</u> with approval and holding that exclusions for fraud and collusion are sufficient to balance the competing interests of the insurer and the insured). Given this state of the law, we agree with the district court that it is prudent to avoid attempting to predict how the Missouri Supreme Court would resolve the issue.

Here, the clarity of additional, more specific policy language obviates the need to make such a prediction. The policy expressly excludes from the definition of Loss amounts "not indemnified by the Insured Organization for which the Insured Person is absolved from payment by reason of any . . . agreement." In accordance with the most natural reading of this plain policy language, and in the context of the policy as a whole, we believe it is clear that Yarrick is "absolved from payment" by the Assignment Agreement. <u>See</u> <u>Travelers Prop. Cas. Ins. Co. of Am. v. Nat. Union Ins. Co. Of Pittsburgh</u>, 621 F.3d 697, 717 (8th Cir. 2010) (discussing Missouri's standard for insurance policy interpretation).

The Trust presents two separate arguments urging us to find the policy language, "absolved from payment," inapplicable. First, the Trust appears to argue that the term "absolved" carries with it the concept of an absolute release from adverse consequences such that any conceivable negative impact of the judgment serves as a loss. According to the Trust, even though Yarrick is excused from paying other than

through insurance proceeds, he will effectively suffer the stigma of a judgment and could enjoy less insurance coverage in any future action that may arise. While these collateral consequences of the judgment might impact Yarrick, they do not change the fact that he is, in fact, absolved from *payment* by the Assignment Agreement. The relevant policy language is absolved from "payment," not absolved from all consequences. The Trust's attempt to focus exclusively on the term "absolved" out of context and divorced from the term "payment" is an impermissible and unnatural parsing of the policy language.[8] Id. ("[W]e read the relevant provisions, each in the context of its corresponding insurance policy as a whole[.]")

Second, the Trust argues we should not focus on the concept of loss at all. Citing Wintermute v. Kansas Bankers Sur. Co., 630 F.3d 1063 (8th Cir. 2011), the Trust asserts all that is required for coverage is a "Claim" for a "Wrongful Act." We reject this argument because we neither agree with the Trust's expansive reading of Wintermute nor believe Wintermute controls the present case. In Wintermute, the underlying facts involved a criminal complaint against a former bank director and a D&O insurer's refusal to tender a defense in the criminal case. There, the district court determined that the criminal complaint was not a "claim for a loss" and did not trigger the duty to defend. Id. at 1068.

---

[8]The Trust takes particular issue with Federal's assertion in its denial letter that Yarrick had no reason to defend himself. The Trust argues that Yarrick was not, in fact, absolved from having to pay defense costs and that Federal wrongfully denied defense costs. We make no comment on the propriety of Federal's assertion in its denial letter that Yarrick had no reason to defend himself. We note only that the Trust asks our Court to hold the insurers must provide coverage for the $56 million judgment against Yarrick. Regardless of the propriety of Federal's statements regarding Yarrick's need to defend himself, and regardless of whether Yarrick was "absolved from payment" of any potential defense costs by any agreement, he was absolved from payment of the amount the Trust actually seeks in this action.

The Eighth Circuit reversed, finding the claim for a "wrongful act" rather than a "claim for a loss" triggered the duty to provide coverage for the criminal defense. Id. at 1069. Contrary to the Trust's assertions, however, Wintermute did not hold the existence of loss to be immaterial. Rather, Wintermute held a Claim for a Wrongful Act triggered coverage and that the cost of the criminal defense itself satisfied the applicable policy's definition of "Loss." The Court stated:

> The parties do not dispute that the criminal actions alleged in Wintermute's criminal case are claims against Wintermute for a wrongful act, nor do they dispute that *the attorney's fees she expended in defending herself are an amount she is legally obligated to pay stemming from that claim for a wrongful act [i.e., a "Loss"]*. Therefore, for coverage purposes, the covered counts of the criminal indictment are claims for a wrongful act against Wintermute, and KBS *must indemnify Wintermute for any Loss she is obligated to pay by reason of the criminal indictment.*

Id. at 1069 (emphasis added). Because no party in Wintermute disputed the fact that the attorney's fees qualified as a Loss, Wintermute simply did not address today's loss-definition question. Further, in the present case, the Trust's prayer for relief does not seek reimbursement for defense costs Yarrick may have incurred prior to the pre-answer settlement of the Trust's claims against him. Rather, the Trust seeks insurance coverage for the entire $56 million stipulated judgment. Finally, unlike the policy at issue in Wintermute, the present policy includes no duty to defend and includes "Defense Costs" as a form of "Loss" only as related to an otherwise-covered claim. Based upon these several distinguishing facts, Wintermute does not control.

Because the Assignment Agreement that transferred to the Trust the limited right to sue Yarrick for insurance proceeds "absolved" Yarrick from "payment," the $56 million judgment is not a "Loss" as required by the plain language of the policy.

## B. Abandoned Insured Theory / Coverage by Estoppel

In the alternative, the Trust relies on cases holding that, where an insurer contests coverage or wrongfully refuses to tender a defense, the insured may enter into a reasonable settlement discharging personal liability and empowering the plaintiff to seek recovery from the insurer. The Trust refers generally to these cases as "abandoned insured" cases and cites Eighth Circuit and Missouri authority as supporting its position. See, e.g., Esicorp, Inc. v. Liberty Mut. Ins., Co., 193 F.3d 966, 970 (8th Cir. 1999) ("Missouri law recognizes that, by refusing to defend, the insurer gives up its contractual right to control the defense of the underlying action and frees the insured to negotiate a reasonable settlement with the plaintiff. In this situation, the general rule in Missouri is that the insured . . . or an assignee . . . may recover the amount of the settlement absent collusion or bad faith."); Hyatt Corp. v. Occidental Fire & Cas. Co. of N.C., 801 S.W.2d 382, 388 (Mo. Ct. App. 1990). Pursuant to this theory, the insurer, having breached a duty to provide a defense and having left the insured to face defense costs and potential liability without the benefit of coverage, is estopped from challenging the insured's litigation decisions, management of the defense, and certain aspects of the insured's settlement with the plaintiff.[9]

The material question for the present case, however, is not whether estoppel may prevent an insurer from contesting the handling of a case. The question is

---

[9]The Trust cites Miller v. Shugart, 316 N.W.2d 729 (Minn. 1982) and "Miller-Shugart Agreements" as examples of this theory. In Miller, however, the issue was whether an insured breached a duty to cooperate by settling with a plaintiff before resolution of an insurer's wholly separate challenge to coverage. Miller did not involve a question of "coverage by estoppel" because, in Miller, the coverage question was resolved against the insurer and in favor of coverage in a separate proceeding. Miller, then, involved only the question of the timing of the insured's settlement and the plaintiff's ability to assume the insured's rights and proceed against the insurer. It did not involve the question of whether actions by the insured or the insurer somehow expanded coverage beyond that provided in the relevant policy.

whether Missouri law allows such an estoppel theory to expand coverage beyond the terms of the policy to convert an otherwise uncovered claim into a covered claim. In Esicorp, our court answered this exact question and refused to allow the expansion of coverage by estoppel. See Esicorp at 970–71 (asking "whether . . . breach of the duty to defend expand[s] the insurer's duty to indemnify, thereby entitling the insured to a windfall in the form of greater insurance coverage than it would have obtained had the insurer defended the underlying case" and holding no such expansion of coverage possible pursuant to Missouri law). See also Royal Ins. Co. of Am. v. Kirksville Coll. of Osteopathic Med., Inc., 304 F.3d 804, 807 (8th Cir. 2002)); Dickman Aviation Servs., Inc. v. United States Fire Ins. Co., 809 S.W.2d 149, 152 (Mo. Ct. App. 1991) (holding that if an insurer fails to defend an action involving covered and uncovered claims and the claims result in a recovery against the insured, "the insurer is liable for the recovery . . . on a claim covered by the policy, but no liability for the recovery will rest upon the insurer if the recovery is on a noncovered claim" (quoting 44 Am. Jur. 2d Insurance § 1418)); Butters v. City of Independence, 513 S.W.2d 418, 425 (Mo. 1974) (remanding for a trial to determine whether a loss was within the coverage of a policy after an insured settled a case following an insurer's breach of a duty to defend). Applied to the present policy, Esicorp precludes use of the Trust's abandoned-insured, estoppel theory to expand coverage. As such, the estoppel theory cannot be used to disregard the "absolved from payment" exclusion from the Loss definition.

The Trust cites cases purportedly disagreeing with this position. For example, the Trust cites Twin City Fire Ins. Co. v. Ochio Cas. Ins. Co., 480 F.3d 1254, 1258–59 (11th Cir. 2007), in which the Eleventh Circuit, applying Alabama law, refused to allow an insurer to invoke a contractual defense to coverage after abandoning its insured. There, however, the defense to coverage was an exclusion based upon a notice and consent provision regarding settlements by the insured, and that court merely held that such a provision is waived by an insurer's express refusal to participate. Id. at 1258 ("The no-action clause must be deemed waived to avoid

putting the insured in a precarious situation."). See also, In re Feature Realty Litigation, 634 F. Supp. 2d 1163 (E.D. Wash. 2007) (refusing to permit a denial of coverage based upon a cooperation clause where the insurer had refused to participate). In the present case, in contrast, the policy term at issue is the definition of Loss, not a cooperation or consent clause more closely tied to the insurer's conduct or the insured's handling of the litigation.

Regardless, our role, is to apply Missouri law and to apply the law of our circuit as determined by a prior panel. Our court held in Esicorp that, although Missouri recognizes certain limitations upon non-participating insurers' ability to contest litigation decisions, Missouri does not allow estoppel to extend coverage over otherwise uncovered claims. Esicorp, 193 F.3d at 971. This was true in Esicorp where the policy contained a duty to defend, and it also is true here, where the policy contains no such duty.

We affirm the judgment of the district court.

_____